IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| VIRGINIA R. COPE-WATSON, <br> PLAINTIFF, | § § § | |
| VS. | § | CIVIL ACTION NO. 4:07-CV-672-Y |
| MICHAEL J. ASTRUE, <br> COMMISSIONER OF SOCIAL SECURITY, <br> DEFENDANT. | § § § § | |

<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER</u>

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

<u>FINDINGS AND CONCLUSIONS</u>

A.  STATEMENT OF THE CASE

Plaintiff Virginia Cope-Watson filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits under Title II and supplemental security income or SSI benefits under Title XVI of the Social Security Act. Cope-Watson applied for SSI benefits on May 26, 2004, and disability insurance benefits on June 28, 2004, with an alleged disability onset date of May 20, 2004. (Tr. 65, 458). She was insured for purposes of disability insurance benefits at all times relevant to the Commissioner's decision.

After the Social Security Administration denied her applications for benefits initially and on reconsideration, Cope-Watson requested a hearing before an administrative law judge (the "ALJ"). ALJ James Wendland held a hearing on December 13, 2006, in Fort Worth, Texas, which Cope-Watson attended accompanied by her representative. (Tr. 478). On March 23, 2007, the ALJ issued a decision that Cope-Watson was not disabled and was not entitled to disability insurance or SSI benefits. (Tr. 19-26). The Appeals Council denied review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 5).

B.   STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to

the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.  ISSUES

Cope-Watson alleges that the Commissioner's decision is not supported by substantial evidence.

D.  ADMINISTRATIVE RECORD

1.  Treatment History

Cope-Watson has a history of depression and bipolar disorder for which she has received mental health services from Mental Health and Mental Retardation of Tarrant County (MHMR) since 1995. (Tr. 166-74). In April 2004, she reported moderate levels of hostility, depression, and anxiety associated with her diagnosed bipolar disorder, and exhibited moderate functional impairment. The clinician opined that Cope-Watson was being uncooperative during the assessment. (Tr. 147-48). She was assigned a Global Assessment of Functioning (GAF) score of 50.[1] (Tr. 182). Upon reassessment on July 26, 2004, she exhibited very mild symptoms related to her bipolar disorder and moderate functional impairment. (Tr. 142-43). In August, Cope-Watson requested additional counseling services because she was experiencing a lot of stress related to her finances, unemployment, and family. (Tr. 177). Her medication was increased and resulted in a reported improvement in her mood. (Tr. 347).

Cope-Watson underwent a mental status examination with psychologist Raymond Finn on September 8, 2004. (Tr. 203). She reported lifelong relationship problems, but had been able to

---

[1] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

maintain employment until recently. Medication helped control her rage and indiscriminate sexual behavior, but did not alleviate her depression or her difficulty maintaining employment. (Tr. 203).

Cope-Watson stated that she was able to dress and groom herself without assistance or prompting, and she lived alone. She traveled and used public transportation, shopped, cooked, and handled her own finances. She reported arising between 9:00 and 11:00 a.m., and going to bed between 8:00 and 11:00 p.m. During the day, she worked if she had a job, watched television, visited friends at a coffee shop, played computer games, cleaned her house, and did her laundry. (Tr. 203). Cope-Watson was one of ten children and admitted being sexually abused as a child, for which she had received counseling. She had a poor relationship with most of her family, but maintained weekly contact with some of her siblings. She had daily contact with two close friends. (Tr. 204).

Cope-Watson completed high school and one year of college, and received vocational training as a receptionist and salesperson. She also worked as a teacher's aide, cashier, file clerk, data entry clerk, and pharmacy technician. She believed that she lost her last job because her coworkers complained about her and her employer could not tolerate her bipolar disorder. (Tr. 204). She had never been hospitalized for mental health problems. She had been married three times. Her first and second marriages ended within a year because her husbands were physically abusive and drank alcohol. Her relationship with her current husband began while he was married to someone else. He had been convicted of murder and imprisoned, but they continued to correspond with each other and eventually married. Cope-Watson smoked cigarettes and admitted to past substance abuse, but denied any current use of alcohol or illegal drugs. (Tr. 204).

Finn reported that Cope-Watson was cooperative and friendly, but somewhat immature and seemed to enjoy her identity as someone with bipolar disorder. Her speech was clear and intelligible, and there was no evidence of looseness of association in her thinking, but some of her responses were vague and required follow-up questions to obtain the appropriate level of detail. At times she appeared to be frustrated with the questions. Her abstract thinking was appropriate. She reported suicidal thoughts, but no specific plan. She had homicidal thoughts while married to her second husband, but had not had those thoughts since they divorced. (Tr. 205). Finn also found that Cope-Watson's affect was somewhat shallow and shifted rapidly during the interview. She reported continued depression despite medication, and had trouble sleeping if she did not take her medication. She had low energy, but enjoyed being around her grandchildren. (Tr. 205). Cope-Watson was oriented, understood why she was being evaluated, and demonstrated average intelligence and processing speed. Her memory appeared to be intact, but she was mildly distractible. Her insight and judgment were assessed as inadequate. Although Cope-Watson correctly identified the appropriate course of action when given three scenarios, Finn noted that her overall life choices reflected poor judgment. (Tr. 205).

Finn diagnosed bipolar disorder and a personality disorder, and assigned a GAF score of 61.[2] Cope-Watson's prognosis was considered poor because she was on moderately high dosages of medication, but continued to experienced depression-related symptoms. (Tr. 205). Finn opined that the ineffectiveness of her medications might indicated a need for an increased dosage or might be attributable to her personality disorder. Finn also opined that Cope-Watson's personality disorder

---

[2] A GAF score of 61-70 reflects mild symptoms or some difficulty in social, occupational, or school functioning, but the individual generally functions pretty well. DSM-IV at 34.

interfered with her work performance more than her bipolar disorder, and she might benefit from psychotherapy to improve her social skills and conflict management training. (Tr. 206).

State agency medical consultant Jack Anderson assessed Cope-Watson's mental impairments in October 2004 and found evidence of an affective disorder and a personality disorder. (Tr. 212). He opined that these disorders imposed mild restriction in her activities of daily living, moderate difficulty in maintaining social functioning, and moderate difficulty maintaining concentration, persistence or pace, and had resulted in one or two episodes of decompensation. (Tr. 222).

Anderson also completed a mental residual functional capacity assessment in which he found moderate limitation in Cope-Watson's ability to understand, remember or carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in work setting; set realistic goals or make plans independently of others. (Tr. 208-09). Anderson concluded that Cope-Watson could understand, remember and carry-out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings. (Tr. 210).

Cope-Watson was referred for psychological testing with Paul Warren, Ph.D., on December 9, 2004, as part of a rehabilitation assessment. (Tr. 227). Cope-Watson was forty-five years old and

had a twenty-five year old son from her first marriage. She had been married three times and divorced twice. Her current husband had been incarcerated during their entire marriage, but was eligible for parole in 2005. Cope-Watson was graduated from high school in 1978 and had attended college for one year. She was undecided about her current vocational goals. Cope-Watson had a history of substance abuse beginning at age 14, which included marijuana use, but reported that she had not used marijuana for a year. (Tr. 228).

Cope-Watson was on time for her evaluation. She appeared to be tired, but was generally attentive and minimally cooperative. Warren thought she was rather defensive and she frequently challenged the purpose of the testing. (Tr. 228). Her gross and fine motor skills were unimpaired, as were her posture and gait. She maintained minimal eye contact and demonstrated adequate interpersonal skills, but her relatedness was impaired. Her mood was considered mildly dysphoric, irritable, and anxious, and her affect was poorly modulated. Cope-Watson's thought processes were goal-directed and logical, with no evidence of hallucinations, delusions, or illusions.

Intelligence testing resulted in a full scale IQ score of 96, which was within the average range of intellectual functioning. Cope-Watson demonstrated generally intact attention-concentration skills; average spatial-motor skills; and an average overall fund of knowledge. She exhibited a capacity for abstract reasoning, but had limited frustration tolerance for challenging problems. (Tr. 229). Personality testing indicated that her depressive symptoms were in partial remission, although she reported pervasive thoughts of powerlessness and hopelessness and suicidal ideations. Warren noted that Cope-Watson's moods were unstable despite medication and she was prone to physical aggression. (Tr. 229).

Warren diagnosed bipolar disorder in partial remission and a borderline personality disorder, and assessed a current GAF score of 48. He recommended that Cope-Watson continue her current psychiatric treatment, and thought that counseling might assist her in clarifying her vocational goals. (Tr. 229). He also recommended that she participate in vocational training through the Texas Rehabilitation Commission. (Tr. 230).

On reconsideration in February 2005, state agency psychologist J.D. Marler reviewed Cope-Watson's medical records, including Warren's recent assessment. Marler concurred with the diagnoses of an affective disorder and a personality disorder. (Tr. 245). Marler further found mild restriction in Cope-Watson's activities of daily living; moderate difficulty in her ability to maintain social functioning; mild impairment in her ability to maintain concentration, persistence or pace; and no evidence of episodes of decompensation. (Tr. 255). Marler also prepared a written assessment of Cope-Watson's mental residual functional capacity with findings similar to Anderson's assessment in October 2004. (Tr. 241-43).

On December 22, 2004, Cope-Watson was tearful, sad and anxious during her MHMR visit and complained of trouble with her family. (Tr. 332). New medications were prescribed for her. (Tr. 330). During a MHMR session on January 31, 2005, Cope-Watson was somewhat tearful, depressed and agitated. (Tr. 327). In February 2005, Cope-Watson asked that her dosage of Lexapro be decreased because it made her "too hyper." (Tr. 319). In May 2005, Cope-Watson began individualized counseling sessions, which she reported were more helpful than her medication. She also felt reassured with the diagnosis of a borderline personality disorder because mood instability had been a long-term problem for her. (Tr. 306). Cope-Watson was worried during

her MHMR visit on October 11, 2005, because she was concerned about her granddaughter. She blamed increased stress for disrupting her sleep and concentration. No changes were made to her medications. (Tr. 286). Cope-Watson also sought counseling with Agape Christian Counseling Service in 2005 to address relationship problems, depression, suicidal thoughts, and her efforts to obtain employment. (Tr. 407-23).

On February 15, 2006, Cope-Watson rated her anxiety and depression as moderate to moderately severe. (Tr. 275). She told her counselor at MHMR that she was anxious about her grandchildren and she complained of a decrease in her energy. Her medications were increased to address her symptoms. (Tr. 271-72). In June 2006, she was exhibiting mild or very mild symptoms related to her bipolar disorder. (Tr. 265). On October 27, 2006, Cope-Watson complained of irritability and agitation despite her compliance with treatment. (Tr. 429).

2. Administrative Hearing

Cope-Watson testified that her primary problem was depression that varied from mild to extreme, accompanied by suicidal thoughts and plans. (Tr. 481). Within the past year she had asked to be hospitalized for psychiatric treatment, but her request was refused. Cope-Watson testified that she was on medication that helped level out her moods, but did not alleviate her depression. (Tr. 482). Her medications also made her feel jittery, gave her nightmares, and caused her to gain weight. (Tr. 497). She sometimes missed taking her medications or took them later in the day than prescribed. (Tr. 485). She admitted using marijuana at a Halloween party a few months before the hearing, but indicated that her primary problem was cigarettes and she was trying to quit smoking. (Tr. 486). Cope-Watson testified that she had developed asthma and more allergies as she had

gotten older, which caused recurring episodes of bronchitis and pneumonia. (Tr. 484).

Cope-Watson testified that she and another employee, who also had a bipolar disorder, were laid off from their jobs at a Montessori school in May 2004. She explained that she had some conflict with the teachers and that the wife of her employer did not like her. (Tr. 491). She also testified that her personality disorder contributed to her trouble because it caused social problems for her and made her hostile. (Tr. 492-93). She admitted that she difficulty handling her finances. Her parents had provided for her by giving her a residence, but she did not own it outright and could not sell it. She also received an allowance of $400 each month to pay her utilities and expenses. (Tr. 494). Cope-Watson testified that she was no longer in therapy because she could not afford it. (Tr. 496).

Vocational expert Carol Bennett testified that most of Cope-Watson's previous work had involved semi-skilled jobs requiring light exertion, including her work as a pharmacy technician, cashier, inventory clerk, file clerk, and teacher's aide. (Tr. 501). The ALJ asked Bennett to consider the following hypothetical person:

> 47 years of age with a high school level education. Same past work experience as the claimant and the ability to do light work with the following specific restrictions. Not required to climb scaffolds, ladders and ropes. Not required to handle [or] finger objects more than frequently. Not required to work with more than a mildly decreased ability to maintain concentration and attention. Not required to understand, remember and carry out more than simple instructions. Not required to have more than superficial interaction with coworkers. Not required to interact with the public. Not required to adapt to more than simple changes in a routine work setting more often than on a weekly basis. Not required to be exposed to excessive dust, fumes or gases more than incidentally on a rare basis or to be expose to extreme temperature and high humidity.

(Tr. 502). Bennett testified that none of Cope-Watson's past work would be suitable, but there

would be other jobs that the hypothetical person could perform. Examples included light, unskilled employment as an inspector, with approximately 48,000 jobs in the nation, and as a sorter or grader, with at least 25,000 jobs in the nation. Bennett affirmed that the numbers she gave were reduced to account for the hypothetical restrictions. She also affirmed that her testimony did not conflict with information in the Dictionary of Occupational Titles (DOT). (Tr. 503). Cope-Watson's representative had no questions for the vocational expert. (Tr. 504).

3.   ALJ Decision

The ALJ found that Cope-Watson had not engaged in substantial gainful activity since her alleged onset date. (Tr. 20). He found that her bipolar disorder, depression, and asthma were severe, but she had no impairment or combination of impairments meeting or equaling any listed impairment. (Tr. 21). The ALJ further found that Cope-Watson retained the residual functional capacity for the sustained performance of light work[3] that did not require climbing; handling or fingering objects more than frequently; working with more than a mildly decreased ability to maintain attention and concentration; understanding, remembering or carrying out more than simple instructions; more than superficial interaction with coworkers; interacting with the public; adapting to more than simple changes in routine work-setting more often than a weekly basis; or exposure to excessive dust, fumes and gases more than incidentally or exposure to extreme temperatures and high humidity. (Tr. 21). Although Cope-Watson was unable to perform her past relevant work, the ALJ relied on vocational expert evidence to find her capable of performing other work that existed

---

[3] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

in significant numbers in the national economy. (Tr. 25-26). Accordingly, the ALJ found that Cope-Watson was not disabled and was not eligible for disability insurance or SSI benefits. (Tr. 26).

E. DISCUSSION

Cope-Watson asserts that the Commissioner's decision is unsupported by substantial evidence because the ALJ did not consider all of her vocationally significant impairments and based his decision on unreliable vocational expert testimony. In particular she argues that the ALJ did not consider the impact that her personality disorder has on her residual functional capacity (RFC).

RFC reflects the most that an individual can still do despite his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a) SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SOCIAL SECURITY RULING 96-8p; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SOCIAL SECURITY RULING 96-8p. RFC is not the least an individual can do, but the most. *Id.* The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. *Id*. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id.*

Cope-Watson asserts that the ALJ failed to consider her borderline personality disorder to be a severe impairment, which in turn resulted in a flawed RFC assessment. The record does not support her assertion. A review of the ALJ's decision as a whole finds that the ALJ considered Cope-Watson's personality disorder at all stages of the sequential evaluation process, including the

RFC assessment.

At the second step of the sequential evaluation process, the ALJ identified Cope-Watson's severe mental impairments as bipolar disorder and depression; however, he also explained that the evidence of her mental impairment most closely resembled Listing 12.04, which addresses affective or mood disorders, and Listing 12.08, which addresses personality disorders. (Tr. 21, 23). *See generally* 20 C.F.R. Part 404, Subpart P, app. 1, §§ 12.04, 12.08. He proceeded to appraise her impairments against the criteria of both of these listings and found only mild limitation in her daily activities; moderate limitation in her social functioning; moderate limitation in her concentration, persistence or pace; and no episodes of decompensation with accompanying loss in adaptive functioning. (Tr. 23). Because neither listing was satisfied, he turned to an assessment of her RFC. (Tr. 24). In assessing Cope-Watson's non-exertional limitations, the ALJ expressly stated that he was assigning the most liberal interpretation to her symptoms and had imposed "ample limitations to reduce stress based on her Bipolar and Personality Disorders." (Tr. 25). The ALJ's decision reflects that he had an adequate appreciation of the nature of her mental impairments, including her personality disorder.

Cope-Watson asserts that the ALJ's determination is not supported by substantial evidence and conflicts with the findings from treating sources who have consistently assessed GAF scores reflecting severe limitations in functioning and the consultative examiner's reports of a poor prognosis. The ALJ reviewed the MHMR reports and the consultative evaluations. He observed that Cope-Watson's symptoms were exacerbated by situational factors, but she oftentimes presented with only mild symptoms. He also noted that Cope-Watson's impairments were responsive to

adjustments in her medication, and she continued to seek employment during the relevant time period. (Tr. 22). Cope-Watson cites no authority to suggest that GAF scores alone are determinative of a claimant's ability to work or should be viewed in isolation and without regard to other evidence in the record. *See Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)(noting that GAF scores may be helpful, but ALJ's failure to reference those scores does not render RFC assessment inaccurate); *Lewis v. Barnhart*, 460 F.Supp.2d 771, 785 (S.D. Tex. 2006)(finding that GAF score is not absolute determiner of an ability to work). Moreover, the ALJ affirmed that he reviewed all of the evidence in making his determination, (Tr. 19), and Cope-Watson has not demonstrated that the various restrictions included in her RFC are insufficient accommodation of her mental impairments.

Cope-Watson also complains that the ALJ did not address the state agency medical consultants' opinions. Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence from non-examining sources at the administrative hearing and Appeals Council levels of review. 20 C.F.R. §§ 404.1527(f), 416.927(f); SOCIAL SECURITY RULING 96-6p. The administrative law judge and the Appeals Council are not bound by the state agency consultants' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions. SOCIAL SECURITY RULING 96-6p. Social Security Rulings are binding on the Administration, and an agency must follow its own procedures, even if those procedures are more rigorous than what would otherwise be required. *Hall v. Schweiker*, 660 F.2d 116, 119 & n.4 (5th Cir. [Unit A] 1981)(per curiam). Should the agency violate its internal rules and prejudice result, the proceedings are tainted

and any action taken cannot stand. *Hall*, 660 F.2d at 119.

The ALJ expressly relied on the state agency medical consultants to support his determination at Step Three that Cope-Watson had no impairment or combination of impairments meeting or equaling any listed impairment. (Tr. 21). The ALJ did not address the functional assessments provided by the state agency medical consultants, but Cope-Watson fails to demonstrate prejudice as a result. Neither of the state agency medical consultants found Cope-Watson disabled despite assessing moderate limitation in some areas of her occupational functioning. Both of the state agency medical consultants found she was capable of basic work-related mental activities, including understanding, remembering, and carrying out detailed instructions; making decisions; attending and concentrating for extended periods; accepting instructions; and responding appropriately to change in routine work settings. (Tr. 210, 243). *See generally* 20 C.F.R. §§ 404.1521, 416.921 (outlining the basic work activities required of most jobs). In comparison, the ALJ imposed a more restrictive mental RFC than the state agency medical consultants would have required.

The ALJ considered all of Cope-Watson's vocationally significant impairments in reaching his decision. His assessment of her RFC accommodates the limitations imposed by her mental impairments and is supported by substantial evidence.

Cope-Watson also asserts that the Commissioner failed to establish the existence of other work in significant numbers that she can perform because the ALJ relied on vocational expert testimony that was not responsive to the hypothetical. She concedes that the ALJ presented a hypothetical that was identical to his assessment of her RFC, which included a restriction to simple

work, but argues that the vocational expert identified jobs that are inconsistent with this limitation.

Cope-Watson complains that the vocational expert identified only the generic categories of inspectors, sorters, and graders, rather than specific jobs. A vocational expert is called to testify because of his familiarity with job requirements and working conditions. *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir.1986). The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. *Vaughan*, 58 F.3d at 132; *Fields*, 805 F.2d at 1170. Using that expertise, Bennett testified about work available for a worker with Cope-Watson's RFC, the number of jobs that would be available after factoring in the worker's functional limitations, and the consistency of her testimony with published vocational resources.[4] Even if the vocational expert's testimony could have been more precise, there must be substantial prejudice to justify disturbing the Commissioner's decision. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Cope-Watson makes conclusory assertions of inconsistencies in the vocational evidence, but has not demonstrated that the vocational expert offered unreliable testimony.

When vocational resources are used and an individual is found to be not disabled, the determination or decision must include examples of occupations/jobs the person can do functionally

---

[4] The ALJ has a duty to inquire into the existence of conflict between expert testimony and the DOT and resolve any conflict. *See generally* SOCIAL SECURITY RULING 00-4p. The ALJ addressed this issue during the hearing and the vocational expert affirmed that there was no conflict. In her reply brief, Cope-Watson cites three specific inspector, sorter or grader jobs in the DOT that exceed her RFC, but she has also acknowledged that there are hundreds of listings in the DOT that could fall within the occupations identified by the vocational expert. Her selective recitation of listings that patently do not fit within the hypothetical cannot overcome vocational expert testimony that expressly accounted for the limitations given by the ALJ and reduced the number of available jobs accordingly. *Cf. Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000)(cautioning against allowing a claimant to scan the record for unexplained conflicts between expert witness testimony and the voluminous provisions of the DOT and then present the conflict as reversible error when the conflict was not considered sufficient to merit adversarial testing during the hearing).

and vocationally along with a statement of the incidence of such work in the region in which the individual resides or in several regions of the country. SOCIAL SECURITY RULINGS 83-12, 83-14. The ALJ's decision contains all of this information, which was provided by the vocational expert. (Tr. 26). Support for the ALJ's decision would have been clearer had he asked the vocational expert to specify the listing or listings in the DOT that are consistent with unskilled work as an inspector, sorter or grader, but that is not required.

The vocational expert's testimony constitutes substantial evidence to support the ALJ's determination at Step Five that Cope-Watson was capable of performing other work that existed in significant numbers in the national economy.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until August 29, 2008. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28

U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until August 29, 2008, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED AUGUST 7, 2008.

  /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE